IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

TERRI L. JACKSON,                          )
                                           )
                                           )        Case No.: 09 C 50028
                         Plaintiff,        )
                                           )
                                           )        Hon. P. Michael Mahoney
            v.                             )        U.S. Magistrate Judge
                                           )
MICHAEL J. ASTRUE                          )
Commissioner of Social Security,           )
                                           )
                         Defendant,        )


## <u>MEMORANDUM OPINION AND ORDER</u>

## I.    <u>Introduction</u>

Terri L. Jackson seeks judicial review of the Social Security Administration

Commissioner's decision to deny her applications for Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title

XVI of the Social Security Act. *See* 42 U.S.C. § 405(g). This matter is before the magistrate

judge pursuant to the consent of both parties, filed on April 14, 2009. *See* 28 U.S.C. § 636(c);

Fed. R. Civ. P. 73.

## II.   **Administrative Proceedings**

Claimant first filed for DIB on or about August 7, 2006, with her application being

completed on or about August 24, 2006 (Tr. 10, 91.)  She alleges a disability onset date of July

25, 2004.  (Tr. 91.)  Her claim was denied initially and on reconsideration.  (Tr. 47, 52.)  The

Administrative Law Judge ("ALJ") conducted hearings into Claimant's application for benefits

on February 13, 2008 (Tr. 18.)  At the hearing, Claimant was represented by counsel and testified.  (Tr. 18–44.)  Dr. Ronald Semerdjian, a Medical Expert ("ME") and James Breen, a Vocational Expert ("VE"), were present and testified.  (Tr. 19.)  The ALJ issued a written decision denying Claimant's application on May 29, 2008, finding that Claimant could perform jobs that exist in significant numbers in the national economy.  (Tr. 15.)  Because the Appeals Council denied Claimant's Request for Review regarding the ALJ's decision, that decision constitutes the final decision of the Commissioner.  (Tr. 1.)

### III.    Background

At the hearing, Claimant testified to the following:

She was 39 years old at the time of the hearing.  (Tr. 22.)  She lived with her husband and her 18– and 22–year old daughters.  (Tr. 23.)  She completed her GED and had been working as a lunch aid at a high school for approximately two hours per day since August or September of 2007.  (Tr. 24.)  Prior to her alleged onset date, Claimant was a legal secretary for approximately one year and worked at the United State Postal Service.  (Tr. 25–26.)  She had stopped working at the Post Office job because of her family situation and because of pain in her back and legs. (Tr. 25.)

Claimant was five feet and eight inches tall and weighed about 320 pounds at the time of her hearing.  (Tr. 22.)  She used to weigh approximately 220 pounds in 2004, and gained 100 pounds in the intervening four years because her activity level became "little to none."  (Tr. 26.) Claimant had surgery on her ankle in July of 2004 and now has nine screws and two plates in her ankle.  (Tr. 31.)  Her back condition was worsened by the ankle surgery and she had surgery on her back in May of 2005 for a herniated disc.  (Tr. 25, 31.)  Her condition had gotten worse over

the year preceding the hearing. (Tr. 27.) She used to have hardly any pain in her leg and by the time of the hearing she described her leg as hurting all the time. (Tr. 27.) She has pain when bending over to pick things up and if she sits for too long she feels that she may fall over. (Tr. 26–27.) At the time of the hearing, she was taking Vicodin three times per day and Tylenol Arthritis occasionally. (Tr. 27.) One of her doctors told her in March of 2007 that he wanted her to have an another back surgery, but she did not have insurance and had not scheduled the procedure. (Tr. 26, 34.)

On a typical day, Claimant would go to work, come home, watch television, do some laundry, and cook dinner. (Tr. 29.) She drives about three to four times a week, but otherwise her husband usually drives. (Tr. 23.) She does her own grocery shopping about twice a month, but often uses a motorized cart and is accompanied by her daughter or husband. (Tr. 24, 28.) She can dust, cook, and do laundry while sitting down, but does not sweep, mop, vacuum, or wash dishes. (Tr. 27–28.) She gets pain in her back and numbness in her legs if she drives for too long and sitting through a church sermon would cause her discomfort and tingling in her legs. (Tr. 23, 29.) She does not have any hobbies and can no longer bowl. (Tr. 29.) At her job, Claimant can stand or sit, and she stated that the pain would prevent her from performing the job for eight hours a day. (Tr. 29.)

Claimant stated that she had problems standing for long periods of time, and that she could stand for the hours that she was at work but it caused her leg to hurt "a lot." (Tr. 30.) She has trouble sitting for long periods because her legs go numb and tingle. (Tr. 30.) She is able to lift a gallon of milk and can use her hands and fingers to button buttons or operate zippers. (Tr. 30.) She has trouble going up and down stairs and needs a railing to do so. (Tr. 30.) Claimant

also had problems with deep vein thrombosis, for which she was taking Warfarin, a blood thinner medication. (Tr. 31–32.) In total, Claimant spent almost $200 per month on medication, and could not afford the additional $900 per month it would cost for her to take Topomax. (Tr. 33.) She was given epidural blocks after her back surgery but they provided no relief. (Tr. 33.) The Vicodin dulls her pain but does not take it away. (Tr. 34.)

The ME testified that Claimant's ankle responded relatively satisfactorily to her surgical procedure. (Tr. 35.) The results of her microdisectomy procedure were less than satisfactory. (Tr. 35.) He noted that an MRI from June 5, 2006 indicated some progressive change with left-sided epidural scarring at the L-4/5 level but that he was "a little bit uncertain" because of a January 2007 note that Claimant was neurologically intact with a negative straight leg raise test. (Tr. 35.) The ME highlighted three medical exams between May and June of 2007 where there was no mention of leg pain, though two of the exams were for unrelated medical issues. (Tr. 35.) The ME opined that Claimant had a capacity between sedentary and medium, at which point the VE interjected that from a vocational standpoint Claimant would be limited to sedentary. (Tr. 36.) The ME stated that Claimant could walk intermittently for two out of eight hours, sit with a sit/stand option, and would have difficulty bending, squatting, or climbing. (Tr. 38.)

The VE testified that Claimant had held only one job in the past where she was gainfully employed. (Tr. 25, 41.) She worked as a mail processor, which was semiskilled and light to medium as Claimant performed it. (Tr. 41.) The ALJ posed a hypothetical to the VE asking what types of jobs could be performed by a person of Claimant's age, education, and work experience with the following limitations: that she be limited to lifting 20 pounds occasionally;

10 pounds frequently; could stand and walk two out of eight hours in divided periods; sit six out of eight hours with sit/stand option approximately every 30 minutes; be limited to occasional posturals, but could not climb any ropes or scaffolds; and should not work around unprotected heights or dangerous moving machinery. (Tr. 41–42.) The VE opined that Claimant could not return to her past relevant work, but that as long as the sit/stand option didn't take her off task for more than 10% of the day or take away from her job site, she would be able to perform the unskilled sedentary jobs of account clerk, eyeglass assembly, or printed circuit board assembly. (Tr. 42.) In total, the VE testified that there were 1,540 such jobs in the Rockford area and 13,700 in the Chicagoland area. (Tr. 42.) The VE also noted that a person who needed to take unscheduled breaks, or a person who would be absent more than 10 to 12 days a year would be unemployable. (Tr. 43.)

## IV.    Medical Evidence

Claimant's medical record reveals complaints of left sided lower back pain dating to a visit with Laura Jill Wirfs, RN, FNP, through Rockford Health System on July 24, 2003. (Tr. 226.) At the visit, claimant stated that her hands and feet are swollen and that her face feels swollen. (Tr. 226.) The medical report also describes how Claimant had increased from 186 pounds two years prior to 271 pounds at the time of the appointment. (Tr. 226.) The treating nurse noted concerns of kidney or thyroid pathology based on Claimant's edema. (Tr. 226.)

On April 16, 2004, Claimant was seen at a Rockford Health System by Nurse Practitioner Wirfs for back pain. (Tr. 228.) Claimant alleged that she had been experiencing pain for about two weeks that was worse on the left side of her back and radiated into her legs. (Tr. 228.) She stated that the pain got as severe as an 8 on a scale of 1 to 10, but that it was currently a 3 and

could be lessened by ibuprofin.  (Tr. 228.)  Claimant was assessed as having sacroiliac fasciitis, or swelling and tenderness of tissue in or around her lower back.  (Tr. 228.)

On August 2, 2004, Claimant saw Dr. Jon B. Whitehurst, M.D., on a referral for consideration of surgery after she reportedly fell while exiting an RV and had been diagnosed at a local emergency room with a sprain of her left ankle and a fracture of her right ankle.  (Tr. 299.)  A CT scan of her right ankle revealed two fractures.  (Tr. 300.)  Dr. Whitehurst assessed Claimant as having an unstable ankle fracture and referred her to Dr. Sorkin for open reduction and internal fixation surgery.  (Tr. 299.)  Claimant's left ankle was placed in a "Cam walker" to allow her to ambulate.  (Tr. 299.)

Dr. Anthony T. Sorkin, M.D., performed surgery on Claimant's right ankle on August 9, 2004.  (Tr. 306–07.)  Procedures were performed on fractures in the distal fibula and the medial malleolus.  (Tr. 307.)  Claimant had at least one plate and numerous screws inserted into her ankle.  (Tr. 306–07.)  Dr. Sorkin reported that Claimant tolerated the procedure well.  (Tr. 307.)  At a September 20, 2004 evaluation, Dr. Sorkin noted that Claimant denied having much pain, but that she felt more pain in her left ankle than her right ankle.  (Tr. 304.)  Dr. Sorkin also indicated that Claimant was wearing a boot on the right ankle, required the use of a walker for ambulation, was unable to negotiate stairs step-over-step, and was receiving help from her kids to do cooking and cleaning.  (Tr. 304.)  Dr. Sorkin ordered Claimant to undergo physical therapy sessions and a home exercise program in order to regain her previous level of function.  (Tr. 305.)

On October 25, 2004 Dr. Sorkin saw Claimant and noted that her ankle was healing, that she was able to stand on her right leg without significant discomfort, and that she could resume

activities as tolerated. (Tr. 295.) On December 12, 2004, Dr. Sorkin reported that Claimant had attended seven of twelve physical therapy sessions with three cancellations and two no-shows. (Tr. 302.) She was able to demonstrate improvement in her range of motion but was still unable to perform stairs step-over-step. (Tr. 302.) Claimant did not show up for her last scheduled appointment and did not schedule any further visits, so she was discharged from physical therapy. (Tr. 302–03.)

Claimant had a visit with Nurse Practitioner Lisa Larson, N.P., at Rockford Clinic on February 24, 2005. (Tr. 235.) Claimant reported persistent back pain since her 2004 accident, and Ms. Larson ordered a lumbar spine x-ray to look for herniation of the disc or narrowing. (Tr. 235.) Nurse Larson indicated that Claimant may need to proceed to an MRI based on the x-ray. (Tr. 235.) On March 14, 2005, Claimant returned to Rockford Clinic to discuss the results of an MRI. (Tr. 237.) Nurse Larson found a large disc herniation based on the MRI and suggested Claimant go to a Pain Center to see a neurosurgeon. (Tr. 237.)

Claimant was referred to Dr. Linda Li, M.D., for an evaluation on March 16, 2005. (Tr. 321.) Dr. Li's notes indicate that Claimant complained of back pain after her fall in 2004 that ranged from a five to an eight on a scale of one through ten. (Tr. 321.) The notes also indicate that Claimant underwent a lumbar x-ray and an MRI on March 11, 2005, which revealed a large central disc herniation at L4-L5 level. (Tr. 321.) Dr. Li noted that claimant had a hard time walking long distances, even while shopping, because of her pain. (Tr. 321.) Dr. Li also recorded that Claimant had been on unemployment for more than a year, but that it was not related to a health reason. (Tr. 321.) Ultimately, Dr. Li suggested Claimant have an EMG, nerve conduction study, and epidural injection. (Tr. 322.) She also suggested that a muscle

relaxant would decrease muscle spasms around Claimant's paraspinal muscles and hamstrings, and prescribed Daypro[1], Neurontin[2], and Zanaflex[3].  (Tr. 322.)

Claimant underwent an EMG and nerve conduction study on March 17, 2005.  (Tr. 318.)  The next day, she received an epidural steroid injection from Dr. Li.  (Tr. 318.)  During the examination prior to the injection, Dr. Li noted that she did not educe any deep tendon reflex and that the knee jerk and Achilles tendon reflex were both absent.  (Tr. 318.)  She also found that the right L5 region was very weak, and that the "right side L5 innervated muscle definitely has neurological weakness."  (Tr. 318.)  The first steroid injection reduced Claimant's pain to a 5/10 on a ten point scale.  (Tr. 315.)  She received two more epidural steroid injections on March 25, 2005 and April 1, 2005.  (Tr. 312, 315.)  At a follow-up visit on April 8, 2005, Dr. Li noted that Claimant's back pain was better and that she was able to sleep a few hours at night, but that her right leg was still weak and felt as though it would give out on her.  (Tr. 310.)  Dr. Li noted that her plan was to refer Claimant to a neurosurgeon, and to physical therapy after the neurosurgeon consult.  (Tr. 310.)

Dr. Li referred the Claimant to Dr. Todd D. Alexander, M.D., S.C., who saw the Claimant on May 12, 2005.  (Tr. 338.)  Dr. Alexander noted that Claimant reported numbness,

---

[1]Daypro (oxaprozin) is a nonsteroidal anti-inflammatory medication that is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis.  Pfizer.com, http://pfizer.com/files/products/uspi_daypro.pdf.

[2]Neurontin (gabapentin) is used to control types of seizures in patients with epilepsy and also used to relieve the pain of postherpetic neuralgia, which includes burning, stabbing pain or aches that may last for months or years after an attack of shingles.  It works by decreasing abnormal excitement in the brain and changing the way the body senses pain.  *PubMed Health Gabapentin*, U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000940.

[3]Zanaflex (tizanidine) is used to relieve the spasms and increased muscle tone caused by multiple sclerosis, stroke, or brain or spinal injury.  It is a skeletal muscle relaxant that slows action in the brain and nervous system to allow the muscles to relax.  *PubMed Health Zanaflex*, U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000106.

tingling, and weakness in her lower extremities, particularly on the right side. (Tr. 338.) He wrote that she had experienced episodes of bladder incontinence since the incident in July 2004 that resulted in a broken right ankle, and that she has difficulty climbing stairs. (Tr. 338.) Dr. Alexander's review of Claimant's March 11, 2005 MRI indicated a very large L4-5 herniated disc of the extrusion variety that fills the majority of the spinal canal, and he recommended surgical treatment. (Tr. 338, 345.)

On May 25, 2005, Dr. Alexander performed microdiskectomy surgery on Claimant. (Tr. 345.) Claimant tolerated the procedure well. (Tr. 346.) She attended a post-operative follow-up visit on May 27, 2005 where she reported some left sciatic buttock pain, but there was no evidence of swelling or pseudomeningocele around the surgical area. (Tr. 337) Claimant was prescribed a Medrol[4] dosepak and Valium for muscle spasms. (Tr. 337.) At a June 3, 2005 follow-up appointment, Michelle Heidel, C.N.R.N., noted that Claimant reported that she was feeling much better and that her leg pain was completely gone. (Tr. 336.) She was given a prescription for physical therapy. (Tr. 336.)

On June 15, 2005, Claimant was evaluated by physical therapist Laura L. Chambers Isely, PT, based on the referral from Dr. Alexander. (Tr. 340.) According to Ms. Chambers Isely's letter to Dr. Alexander, Claimant reported stiffness or pain at times, but no symptoms of numbness or tingling radiating into her legs. (Tr. 340.) The letter also noted that Claimant had been attempting to walk for five to ten minutes per day, which was her maximum. (Tr. 340.) Claimant reported that her goals were to return to being able to perform normal household

---

[4]Medrol (Methylprednisolone Oral) is a corticosteroid that relieves inflammation and is used to treat certain types of arthritis, among other disorders. *PubMed Health Methylprednisolone Oral*, U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000776.

activities, and to be able to begin an exercise program. (Tr. 340.) The letter indicated that Claimant was limited in her lower extremity range of motion and demonstrated decreased mobility and function secondary to her recent surgery. (Tr. 340.) The goals of her physical therapy were to restore a normal pain-free erect posture, to restore full pain-free trunk range of motion in all planes, to allow Claimant to ambulate up to 30 minutes continuously without pain, and to allow Claimant to perform normal household activities with proper body mechanics and neutral spine positioning. (Tr. 341.)

Claimant saw her orthopedist on June 20, 2005, and an ultrasound revealed a deep vein thrombosis that caused Claimant to be referred to the emergency room at Rockford Memorial Hospital. (Tr. 343.) Dr. Asner, on call for Dr. Alexander, prescribed anticoagulation therapy and Claimant was given Lovenox[5] and a prescription for Coumadin[6]. (Tr. 343.) Claimant was discharged from the hospital at her own request in the company of family and with close outpatient follow-up. (Tr. 344.) She followed up with Nurse Larson at Rockford Clinic on June 23, 2005, where it was noted that the leg pain was gone and that she was feeling fine. (Tr. 241.) Claimant was started on anticoagulation therapy. (Tr. 241.)

Dr. Alexander reported to Dr. Li that he saw Claimant on July 7, 2005, and that she reported good relief from her radicular pain. (Tr. 335.) Dr. Alexander's letter noted that Claimant had some leg pain from a deep venous thrombosis that she developed as a

---

[5]Lovenox (enoxaparin) is used to prevent blood clots in the leg in patients who are on bedrest or who are having certain surgeries. *PubMed Health Enoxaparin Injection*, U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000158.

[6]Coumadin (warfarin) is used to prevent blood clots from forming or growing larger, and is used to treat or prevent venous thrombosis and pulmonary embolism. *PubMed Health Warfarin*, U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000634.

complication. (Tr. 335.) Dr. Alexander also noted that there were no "return to work issues" because Claimant was a homemaker. (Tr. 335.) Overall, Dr. Alexander's impression was that Claimant had done well following the surgery, and that she would complete her physical therapy and return to normal activities. (Tr. 335.)

In a letter dated August 29, 2005, physical therapist Chambers Isely sent a letter to Dr. Alexander summarizing Claimant's physical therapy. (Tr. 385.) After her emergency room visit in June 2005, Claimant returned for physical therapy on July 12, 2005. (Tr. 385.) She was able to appear for three total visits, despite being scheduled for twice a week, and cancelled all further visits on August 31, 2005. (Tr. 385.) Chambers Isely noted that Claimant's status was unknown, and that she had not been seen for approximately three weeks. (Tr. 385.)

Rockford Clinic notes by Nurse Larson from visits on November 1, 2005 and November 15, 2005 indicate that Claimant had been seeing a chiropractor. (Tr. 242.) On December 2, 2005, Claimant had a consultation with Dr. Robin Hovis, M.D, where Claimant reported back pain and swelling over the past several months. (Tr. 221.) Dr. Hovis also indicated Claimant had a history of blood clots after her back surgery, and opined that more blood work was needed. (Tr. 221.) Claimant had visits with Nurse Larson at Rockford Clinic on March 9, 2006 and April 10, 2006 where back pain was mentioned, but was not the primary reason for treatment or diagnosis. (Tr. 244–45.)

On May 22, 2006, Claimant returned to Rockford Clinic complaining of pain in her left thigh. (Tr. 246.) Claimant reported pain that was gluteal in nature and traveled down her legs to her ankle if she lays flat. (Tr. 246.) Claimant could not do any straight leg raises and stated that it was difficult to get out of bed. (Tr. 246.) Nurse Larson indicated the possibility of a re-injury

or re-herniation, but also noted concern about shortness of breath and chest pain that might indicate a pulmonary embolus. (Tr. 246.) Claimant was sent to the the emergency room of Saint Anthony Medical Center because of the left thigh pain and other symptoms. (Tr. 246, 396–97.) She was discharged with instructions to rest and return to the emergency room if the pain worsened. (Tr. 397.)

On June 19, 2006, Claimant returned to see Dr. Alexander. (Tr. 332.) In a June 22, 2006 letter to Dr. Tracy Cole, M.D., Dr. Alexander reported that claimant had experienced complete relief after her operation until she was walking up and down stairs and developed pain in her left thigh accompanied by numbness and tingling. (Tr. 332.) Dr. Alexander noted that Claimant felt her symptoms were staying about the same, that her reflexes were absent in the lower extremities, and that she had decreased sensation in the left thigh. (Tr. 332.) Dr. Alexander also referred to an MRI of Claimant's spine from June 5, 2006, where he found degenerative disc disease at L4-5 with disc desiccation, disc space narrowing, and end plate reactive changes. (Tr. 332.) Dr. Alexander noted that narrowing of the proximal left neuroforamen was probably the source of her symptoms. (Tr. 332.) His impression was that Claimant had left lower extremity radicular symptoms that appeared secondary to foraminal stenosis and were exacerbated by degenerative disc disease. (Tr. 332.) He referred her to a pain specialist for a series of injections, and mentioned that without improvement, surgical treatment could be considered. (Tr. 332.)

Claimant saw Dr. John Jaworowicz, M.D., on July 27, 2006 for an evaluation for epidural steroid injections. (Tr. 413.) Dr. Jaworowicz reviewed Claimant's MRI and found changes from her past surgery, degenerative changes, moderate disc bulging, and scar tissue around the L4-5

foramen. (Tr. 413.) He placed Claimant on Lyrica[7] at 50 mg with a plan to escalate it to 250 mg three times per day and noted that he would perform a selective nerve root block in about a week. (Tr. 413.) On August 2, 2006, Claimant underwent the transforaminal epidural steroid injection. (Tr. 411.) Dr. Jaworowicz saw Claimant at an August 23, 2006 follow-up visit where he increased her dosage Lyrica and indicated that there was no need to repeat an epidural or nerve root block because she was not having any weakness. (Tr. 410.) Claimant visited Dr. Jaworowicz again on September 20, 2006, and he noted that she had persistent pain in her left leg and had begun to notice right-sided symptoms. (Tr. 450.) Claimant reported improvement on Lyrica but also reported a lot of daytime sedation. (Tr. 450.) Dr. Jaworowicz noted that his plan was to repeat a selective root block after receiving permission to take Claimant off of Coumadin for the procedure. (Tr. 450.)

On October 5, 2006 Claimant underwent a functional capacity evaluation performed by Rachel K. Viel, MS, PT, CWCE, at the request of Dr. Tracy Cole, M.D., and Nurse Larson. (Tr. 428.) The results of the evaluation were that Claimant demonstrated the ability to lift between 10 and 40 pounds occasionally, depending on the type of lift, and between 10 and 20 pounds frequently. (Tr. 434.) Claimant could not perform any floor to waist lifts. (Tr. 434.) Ms. Viel opined that Claimant would have to avoid activities requiring sustained deep squatting, sustained forward bending in standing, sustained forward bending in sitting, crawling, ladder climbing, and heavy tool use. (Tr. 435.) Claimant could only occasionally perform the following: repeated forward bending in standing, repeated forward bending in sitting, sustained kneeling, stepping up

---

[7]Lyrica (pregabalin) is an anticonvulsant used to relieve neuropathic pain that can occur in arms, hands, fingers, legs, feet, or toes in persons with diabetes. It is also used to treat fibromyalgia. *PubMed Health Pregabalin*, U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000327.

and stepping down, stair climbing, balancing, and continuous sitting, standing, and walking. (Tr. 435.) Claimant would need to alternate sitting, standing, and walking per her tolerance, and could not sit, stand, or walk continuously for more than one hour at a time. (Tr. 435.) Claimant's functional capacities were found to deviate between sedentary and medium Department of Labor categories, but Ms. Viel noted that the tolerances to various functional positions must also be factored in. (Tr. 434.)

Dr. Jaworowicz performed a bilateral L4-L5 selective nerve root block procedure on Claimant on October 11, 2006. (Tr. 452.) Dr. Jaworowicz reported that Claimant had experienced some relief from her previous epidural steroid injection, but the relief was fairly brief and Claimant wished to avoid reoperative intervention. (Tr. 452.) Claimant had a follow-up with visits with Dr. Jaworowicz on January 29, 2007 and March 13, 2007. (Tr. 454–55.) She reported that the nerve root block led to only transient improvement, but that an increased dosage of Topamax did improve her ability to sleep. (Tr. 454–55.) At the first visit, Claimant reported no pain with straight leg raising, her reflexes were intact, her dorsiflexion and plantar flexion strength were excellent, she reported some pain over her trochanteric bursa, and no sciatic notch tenderness was noted. (Tr. 454.)

On November 16, 2006, Dr. Marion Panepinto, M.D., evaluated Claimant's record for the state agency and completed a physical residual functional capacity ("RFC") assessment. (Tr. 438.) Dr. Panepinto opined that Claimant could lift 20 pounds occasionally, 10 pounds frequently, stand and/or walk (with normal breaks) for a total of about 6 hours in an 8–hour work day, sit (with normal breaks) for about 6 hours in an 8–hour work day, and that her push and/or pulling capabilities were unlimited. (Tr. 439.) Claimant could climb ramps and stairs frequently

but never ladders, ropes, or scaffolds. (Tr. 440.) She could frequently balance and occasionally stoop, kneel, crouch, and crawl. (Tr. 440.) Dr. Henry S. Bernet, M.D. reviewed the RFC of Dr. Panepinto on February 22, 2007, and affirmed it as written. (Tr. 447.)

## V. Standard of Review

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). The ALJ's legal conclusions are reviewed de novo. *Binion v. Charter,* 108 F.3d 780, 782 (7th Cir. 1997). However, the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Id.* The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case are entrusted to the Commissioner. *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner.").

If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782. If the ALJ identifies supporting evidence in the record and builds a "logical bridge" from that evidence to the conclusion, the ALJ's findings are supported by substantial evidence. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). However, if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

**VI.    Framework for Decision**

"Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled.  *See* 20 C.F.R. § 404.1520.  The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether any other work exists in significant numbers in the national economy which accommodates the claimant's residual functional capacity and vocational factors.  The court will analyze each of these factors to determine whether the Commissioner's decision was supported by substantial evidence.

**VII.   Analysis**

   **A.    Step One: Is the Claimant Currently Engaged in Substantial Gainful Activity?**

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity.  20 C.F.R. § 404.1520(b).  Substantial gainful activity is work that

involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he or she is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

In this case, the ALJ noted that Claimant made an "unsuccessful work attempt in May 2006" and was working at the time of the hearing as a lunch aide in a high school, earning $8 an hour, but that Claimant "has not engaged in substantial gainful activity since July 25, 2004, the alleged onset date." (Tr. 12.) Neither party disputes this determination. As such, the ALJ's Step One determination is affirmed.

### B.      Step Two: Does the Claimant Suffer From a Severe Impairment?

Step Two requires a determination whether the claimant is suffering from a severe impairment. A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers a severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

In performing the Step Two analysis in this case, the ALJ found that Claimant has the following severe impairments: failed back syndrome, status post right ankle fracture and surgical repair, and obesity. (Tr. 12.) The substantial evidence in the record supports the conclusion that Claimant had one or more severe impairments, and the parties do not dispute this determination. Therefore, the ALJ's Step Two determination is affirmed.

**C.     Step Three: Does Claimant's Impairment Meet or Medically Equal an Impairment in the Commissioner's Listing of Impairments?**

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. pt. 404, subpt. P, app. 1.  The listings describe, for each of the body's major systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity.  20 C.F.R. § 404.1525(a).  The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry.  *Bowen v. New York*, 476 U.S. 467 (1986).  Accordingly, if the claimant's impairment meets or is medically equivalent to a listed impairment, then the claimant is found to be disabled and the inquiry ends; if not, the inquiry moves on to Step Four.

In performing the Step Three analysis in this case, the ALJ determined that Claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1.  The ALJ found that Claimant's impairments did not manifest the significant degree of ambulatory dysfunction described in section 1.00B.2.  (Tr. 13.)  The ALJ also found that there was not evidence of spinal nerve root compression as described at section 1.04A.  (Tr. 13.)  As Claimant now argues that the ALJ failed to consider the possibility of a closed period of disability, the court will address the ALJ's findings to determine if substantial evidence supports a finding that there was no period of at least twelve months where Claimant's impairments met or were medically equivalent to a listed impairment.

In order to be adjudged to have a loss of function for the purposes of the listings of impairments, the ALJ must find that Claimant has the inability to ambulate effectively on a sustained basis for any reason that lasts for at least 12 months.  20 C.F.R. pt. 404, subpt. P, app.

1, § 1.00B.2.a. An inability to ambulate effectively is defined generally as "having insufficient lower extremity functioning to permit independent ambulation without the use of hand-held assistive device(s) that limits the functioning of both upper extremities." *Id.* at § 1.00B.2.b.(1). The ALJ noted that Claimant underwent surgery for her ankle fracture in August 2004, and "was ready to resume normal activities as tolerated" and "advised to follow up with her surgeon only as needed" on October 25, 2004. (Tr. 14.) This evaluation is supported by evidence in the medical record. (Tr. 295.) The record further notes that Claimant participated in physical therapy and was able to demonstrate improvement in her range of motion as of December 12, 2004. (Tr. 302.) There is nothing in the record that would indicate Claimant had a sustained inability to ambulate effectively for a period longer than approximately three months based on her ankle fracture and subsequent surgery.

The ALJ also considered Claimant's back pain to determine whether Claimant's symptoms met or were medically equivalent to both section 1.00B.2 and 1.04.A of Appendix 1. (Tr. 13.) Here again, the ALJ's finding is supported by the medical evidence in the record. Reports of Claimant's back pain appear in the medical records from April 16, 2004, and not again until February 24, 2005. (Tr. 228, 235.) During a medical evaluation in March 2005, Claimant reported back pain going back to her August 2004 accident, but there exists no medical evidence from the intervening time period indicating that Claimant's symptoms met or were medically equivalent to a listed impairment. (Tr. 321.) The ALJ accurately noted that Claimant initially underwent conservative treatment, including epidural injections. (Tr. 14, 315.) Prior to her May 25, 2005 microdiskectomy surgery, Claimant was reported to have experienced certain symptoms that may have met the requirements listed in section 1.04A, including reflex loss,

neuro-anamatomic distribution of pain, and neurological weakness in her lower extremities. (Tr. 338.). However, on both June 15, 2005 and July 7, 2005, Claimant reported good relief from her back pain and neurological symptoms, and her neurosurgeon instructed that she complete physical therapy and return to normal activities. (Tr. 335, 340.) Claimant's next visit with her neurosurgeon was not until June 19, 2006, when she reported that she had experienced complete relief after her operation, but that leg pain symptoms had returned. (Tr. 332.) The timeline of events revealed by the medical record supports the ALJ's findings that Claimant's symptoms associated with her lower back pain cannot be said to have met or been medically equal to section 1.04A for a period of twelve months.

Claimant argues the combination of two separate orthopedic conditions that each required surgery would lead to a finding that Claimant cannot perform any work from the onset date of the ankle injury, July 25, 2004, to the RFC evaluation of October 5, 2006. As described by the ALJ, and restated above, neither of Claimant's conditions had the requisite severity or longevity of symptoms to merit a *per se* determination at Step Three that Claimant would have been unable to perform significant gainful activity during this closed period of time. Therefore, the court affirms the ALJ's Step Three determination.

### D.    Step Four: Is the Claimant Capable of Performing Work Which the Claimant Performed in the Past?

At Step Four, the Commissioner determines whether the claimant's residual functional capacity ("RFC") allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his or her impairment. 20 C.F.R. § 404.1545(a). The RFC assessment is based upon all of the relevant evidence, including objective medical evidence, treatment, physicians' opinions and observations, and the

claimant's own statements about her limitations.  *Id*.  Although medical opinions bear strongly upon the determination of RFC, they are not conclusive; the determination is left to the Commissioner who must resolve any discrepancies in the evidence and base a decision upon the record as a whole.  20 C.F.R. § 404.1527(e)(2); *see Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995).

When assessing the credibility of a claimant's statements about his or her symptoms, including pain, the ALJ should consider the following in addition to the objective medical evidence: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication that the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  Social Security Ruling 96-7p; *see* 20 C.F.R. § 404.1529(c).

Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements.  20 C.F.R. § 404.1565(a); Soc. Sec. Rul. 82-62.  If the claimant's RFC allows her to return to past relevant work, the claimant will not be found disabled; if the claimant is not able to return to past relevant work, the inquiry proceeds to Step Five.

In performing the Step Four analysis, the ALJ determined Claimant's RFC to be the following:

"The claimant has the residual functioning capacity to perform

sedentary work as defined in 20 CFR 404.1567(a) except that she must be afforded the opportunity to change position after 30 minutes of sitting, and any two hours of standing or walking should be divided into periodic intervals. She can perform postural activities such as stooping, squatting, crouching, and kneeling on an occasional basis but must avoid ladders, ropes, scaffolds, unprotected heights and dangerous moving machinery. (Tr. 13.)

In making his RFC determination, the ALJ indicated that he considered all of Claimant's symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the medical evidence and other evidence. (Tr. 13.) The ALJ found that Claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms. (Tr. 13.) The ALJ then had to consider the intensity, persistence, and limiting effects of Claimant's symptoms to determine the extent to which they limit Claimant's ability to do basic work activities. Where statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by medical evidence, a finding is made on the credibility of the statements based on a consideration of the entire record. The ALJ found Claimant's statements about her symptoms were not credible to the extent they were inconsistent with the RFC, based on the medical evidence in the record. (Tr. 14.)

The ALJ's RFC determination tracked the testimony of the ME and the VE. (Tr. 35-36.) The ALJ considered Claimant's obesity in making the RFC determination insofar as he found it would cause difficulties with more than occasional bending, squatting, and other postural activities. (Tr. 15.) Claimant argues that the ALJ failed to consider the possibility of a closed period of disability, and failed to factor Claimant's obesity into his RFC. These arguments are more appropriately addressed at Step Five where, as they would not serve to reverse the ALJ's Step Four finding.

22

The VE testified that Claimant held only one job in the past where she was gainfully employed. This job, as a mail processor, was semiskilled and required light to medium work. Because the ALJ's RFC found Claimant was not capable of more than sedentary work, the ALJ held that Claimant was unable to perform any past relevant work. (Tr. 15.) Neither party challenges this finding, and the ALJ's determination at Step Four is affirmed.

**E.** **Step Five: Does Any Other Work Exist in Significant Numbers in the National Economy Which Accommodates the Claimant's Residual Functional Capacity and Vocational Factors?**

At Step Five, the Commissioner determines whether the claimant's RFC and vocational factors allow the claimant to perform any job which exists in the national economy in significant numbers. 20 C.F.R. § 404.1560(c). The burden is on the Commissioner to provide evidence that demonstrates that other work exists. 20 C.F.R. § 404.1560(c)(2). In determining whether other work exists, the Commissioner considers the claimant's RFC and vocational factors in conjunction with the Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, subpt. P, app. 2 (the "Guidelines"). The Guidelines direct a conclusion of "disabled" or "not disabled" upon a finding of a specific vocational profile. Soc. Sec. Rul. 83-11. The Guidelines represent exertional maximums, though, and if the claimant cannot perform substantially all of the exertional demands contemplated by the Guidelines, a conclusion cannot be directed without first considering the additional exertional limitations. Soc. Sec. Rul. 83-11 & 83-12. A vocational expert's testimony, if it is reliable, can satisfy the Commissioner's burden of determining whether a significant number of jobs exist in the economy. *Overman v. Astrue*, 546 F.3d 456, 464 (7th Cir. 2008).

Here, the ALJ made his RFC determination and incorporated his findings of exertional

limitations when posing a hypothetical to the VE. The ALJ then relied on the VE's testimony to find that based on Claimant's age, education, work experience, and RFC, Claimant has not been under a disability from July 25, 2004 through the date of his decision. (Tr. 16.)

However, the ALJ's RFC determination apparently represented an opinion as to Claimant's capacities at the time of her hearing. This was evidenced by the ALJ's emphasis in his opinion on the ME's testimony concerning Claimant's 2007 doctor's visits, including a May 17, 2007 examination noting that Claimant reported no leg pain. For example, the following exchange took place between the ALJ and the ME during Claimant's hearing:

> Q: So it sounds like she doesn't meet or equal the listings?
>
> A: Well, if I look at the reports from May and June of '07, there are not observations of symptoms in that area. Now I don't know whether they failed to record it, but they went through a review of systems including the lower extremities and back and did not comment on there being any symptoms present at that time. [INAUDIBLE] for the consultation from Dr. Alexander which was done in April, I don't find that. (Tr. 36.)

The ME went on to discuss an October 5, 2006 functional capacity evaluation that found Claimant's capacity to be "something between sedentary and medium." (Tr. 36.) Additionally, the ME indicated that his finding concerning the length of time Claimant was able to sit without changing positions was based on her ability to sit during her hearing. To the extent such evidence contains probative value, it is limited to Claimant's current and forward-looking capacities.

Claimant need not have a current disability in order to qualify for DIB benefits under Title II, and the ALJ should have considered the possibility that Claimant was disabled during a closed period lasting at least twelve months. 20 C.F.R. §404.320(b)(3); *see also, Brown v.*

*Massanari*, 167 F.Supp.2d 1015, 1017 (N.D. Ill. 2001).  That this issue was not exhausted before the ALJ or the Appeals Counsel does not foreclose the court's ability to examine whether consideration of a closed period of disability is appropriate.  *See Sims v. Apfel*, 503 U.S. 103 (2000).  The question for the court, then, becomes whether the ALJ's RFC determination could inclusively cover all periods of time dating back to Claimant's alleged onset date.  In other words, the court must consider whether substantial evidence supported the ALJ's finding that Claimant had not been under a disability for any period of at least twelve months between July 24, 2004 and her hearing date.  *Brown*, 167 F.Supp.2d at 1015, 1017.

The court specifically considers the following evidence as to the time period between Claimant's alleged onset date and the October 5, 2006 functional capacity assessment relied upon by the ME and the ALJ:

- Claimant's medical records indicate she was seen for back pain on at least two occasions prior to the incident where she fractured her ankle, including in April 2004 when Claimant reported pain as severe as an eight on a scale of one to ten.

- After her July 2004 accident, Claimant's left ankle was sprained during the same time she was required to have plates and screws surgically inserted to repair her right ankle.  By September 20, 2004, Claimant's ankle surgeon noted she was still using a walker for ambulation, could not negotiate stairs, and was receiving help from her children to do cooking and cleaning.

- Claimant testified that she "couldn't do anything for like two months" after her ankle surgery, and this made her back worse to the point she needed surgery.

- As of December 12, 2004, Claimant's treating physician noted improvement, but Claimant was still unable to perform stairs step-over-step.

- As of February 24, 2005 Claimant reported back pain that dated to her July 2004 accident.  Less than one month later, she was diagnosed with a large disc herniation.

- By March 17, 2005, Claimant's treating physician did not educe any deep tendon, knee jerk, or Achilles tendon reflexes and found neurological weakness.

Claimant was referred to a neurosurgeon who eventually performed a microdiskectomy on May 25, 2005.

- Claimant's physical therapy goals as of June 15, 2005 included restoring a normal pain-free erect posture, restoring full pain-free trunk range of motion, allowing her to ambulate for up to 30 minutes without pain, and allowing her to perform normal household activities with proper body mechanics and neutral spine positioning.

- On June 20, 2005, during her recovery from back surgery, Claimant had to be hospitalized for deep vein thrombosis.

- Claimant discontinued physical therapy for her back on or around August 31, 2005, and the physical therapist's notes indicate that Claimant's status was unknown. Notes from November 2005 appear to indicate Claimant was seeing a chiropractor, but her status is not indicated.

Given Claimant's testimony and the evidence in the medical record, Claimant's ailments might have created a period of continuous disability that lasted twelve months. The fact that Claimant suffered from seemingly separate impairments that may or may not have overlapped, and from which Claimant ultimately recovered to some extent, would not prevent a finding of a closed period of disability. *See Brazzell v. Astrue*, 2009 WL 5217361 (W.D. Ky.) (claimant was entitled to a closed period of disability where his knee surgery and recovery led to exacerbated neck and back pain, and eventually neck surgery, even though the claimant had improved by the time of his hearing).

The court cannot review a determination as to a closed period of disability where the ALJ does not consider it. In the *Brown* case, a court determined that a claimant was entitled to a remand to determine the existence of a closed period of disability where he underwent surgery on his knee pursuant to injuries sustained in an accident, had a subsequent back surgery, and ultimately recovered from the surgeries by the time of his hearing. *Brown*, 167 F.Supp.2d at 1018, 1021. Though the ALJ in that case included medical evidence from the time around the

claimant's surgeries in his opinion, the court noted that "it [was] not clear from his later findings that he evaluated that evidence separately in order to determine if [the claimant] was disabled during the closed period." *Id.* at 1020. Similarly, the ALJ here did not make clear during Claimant's hearing or in his decision that he considered the possibility of a closed period of disability around the times Claimant underwent her surgeries.

In addition to her argument about a closed period of disability, Claimant asserts that the ALJ failed to consider Claimant's morbid obesity in his RFC determination. The ALJ specifically noted Claimant's obesity in determining certain postural limitations that were consistent with the residual functional capacity assessment and other evidence in the medical record. Therefore, the court finds ALJ's RFC determination was appropriate insofar as it addressed Claimant's capacities at the time of the hearing. For reasons discussed herein, the court expresses no opinion as to whether the ALJ properly considered Claimant's obesity for any possible closed period of disability.

In light of the above, the court finds that the ALJ did not draw a logical bridge between the evidence in the record and his finding that Claimant was not disabled for any period of at least twelve months after her alleged onset date. Specifically, the ALJ did not adequately address whether his RFC determination would apply to Claimant's alleged impairments related to her surgeries prior to the October 5, 2006 functional capacity evaluation. Therefore, this matter must be remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum Opinion and Order. Upon remand, the ALJ should consider whether Claimant was disabled for a closed period of at least twelve months during the time period beginning with Claimant's ankle fracture and lasting though the

October 5, 2006 functional capacity evaluation discussed in the ALJ's opinion.  The balance of the ALJ's opinion is affirmed.

**VIII.  Conclusion**

For the forgoing reasons, Claimant's motion for summary judgment is granted, in part, and the Commissioner's motion for summary judgment is denied, in part.  This matter is remanded for a hearing in conformity with this opinion.

**E N T E R:**

**P. MICHAEL MAHONEY, MAGISTRATE JUDGE**
**UNITED STATES DISTRICT COURT**

**DATE**: November 18, 2010